# CITY OF DENVER *v.* DUNSMORE.

*(Supreme Court of Colorado, April Term, 1884—Appeal from the District Court of Arapahoe County.)*

1. MUNICIPAL CORPORATION—DUTY TO KEEP PUBLIC WAYS IN REPAIR —LIABLE FOR DAMAGES RESULTING FROM FAILURE. Under the laws of this State, an implied liability rests upon municipal corporations to keep in repair the streets and bridges within their corporate limits; and actions lie against them at the suits of individuals for special damages suffered in consequence of their failure to do so.

2. SAME—SAME—SAME. The general current of authorities supports the view that when municipal corporations are invested with the exclusive authority and control over such streets and bridges, with power for raising money for their construction, improvement and repair, a duty arises to the public—whether expressly enjoined in the charter or not—from the nature of the powers granted, to keep them in a reasonably safe condition for the ordinary mode of use to which they are subjected, and a corresponding liability rests upon such corporations to respond in damages to those injured by a neglect to perform the duty. Such duty is municipal or ministerial, and not governmental or discretionary.

3. CONTRIBUTORY NEGLIGENCE—PROOF OF. If the plaintiff in his own case, shows that he brought the injury upon himself, he may be nonsuited. But if the defendant's failure of duty and the injury to the plaintiff are shown, and it does not appear that the plaintiff brought on the injury by his own negligence, such proof must come from the defendant.

4. NEGLIGENCE—A FACT FOR THE JURY. When the measure of duty is ordinary and reasonable care, the question of negligence is always one for the jury to determine. When the plaintiff has made a *prima facie* case, the Court will not take it from the jury.

5. MEASURE OF DAMAGES. Where the amount of damages does not depend on computation, as in case of personal injuries, to warrant the Court in setting aside the verdict as excessive, it must appear that the amount of damages given by the jury is so disproportionate to the injury received, as to show that the jury were influenced by prejudice, misapprehension, or some corrupt or improper consideration.

6. EVIDENCE—DISCRETION OF THE COURT. The Court, in furtherance of justice may, in its discretion, allow the usual order of introducing testimony to be departed from. When the defense relies upon expert testimony, it is entitled to put it in after all the evidence bearing on the question offered by plaintiff. And if the Court allows plaintiff to vary the state of facts after the expert testimony has been heard, the expert witnesses may be recalled. If no offer to recall them be made, the case will not be reversed.

BECK, C. J. The principal question raised by the assignment of errors and discussed in the briefs of counsel for both

parties, is, whether an implied liability rests upon municipal corporations proper, under the laws of this State, to keep in repair the streets and bridges within their corporate limits; and whether actions lie against them at the suits of individuals for special damages suffered in consequence of their neglect so to do.

It is conceded that the Legislature has not expressly given such right of action, either by the general statute or by the special charter under which the city of Denver was incorporated. The right to maintain such actions for damages therefor, if it exists, depends upon principle and precedent.

Judgment was rendered against the city, in the Court below, and upon this appeal its counsel says: "In seeking a reversal of this judgment, the reasons urged by appellant may be submitted under two heads:

"1. The corporation of the city of Denver is exempt from all liability to individuals for special damages suffered by reason of failure to repair streets or bridges. The functions of the corporation are purely governmental, and the remedy for malfeasance by public officers is by indictment.

"2. We rely upon the specific exceptions reserved by appellant in the Court below."

Counsel on both sides have discussed the questions involved very fully, and have cited and rely upon, as precedents supporting their respective theories, a list of cases extending from an early period in the seventeenth century, up to the present time.

The several propositions of counsel for the city, upon the first ground for reversal, as we understand them, are substantially as follows:

*First*—That at common law no action for damages lay against a municipality for negligence in the exercise of its public duties or powers.

*Second*—The almost universal rule of decision is, that in the absence of statute to that effect, no such liability attaches to *quasi* municipal corporations, such as counties and unincorporated towns.

*Third*—No such liability is created by any statute of this State, as against either municipal corporations proper, or *quasi* municipal corporations, while the powers conferred by charter

in the one case, and by the general law in the other, respecting the opening and maintainance of highways, and the building and repairs of bridges, are practically the same in both cases. No such liability, therefore, exists in either case.

Illustrative of the doctrine contended for, counsel for appellant says, if this accident had occurred upon a highway outside the city limits, the action could not be maintained against Arapahoe county. The substance of the whole argument is, that the Courts which have held municipal corporations liable to individuals for special damages, have done so in violation of common law principles and precedents, and without assigning any logical reasons why, in absence of an express statute fixing such liability, the same rule of decision should not be applied as in cases of *quasi* corporations, against which it is not pretended that such liability attaches.

Counsel for appellant insists, throughout the entire discussion, that unless this Court can point out a tangible distinction between the powers, privileges and duties of these two classes of corporations, under our statutes, the precedent to be established for this State respecting their liabilities in actions of this character, must be the same for both classes.

As to this proposition, we are of opinion that the argument of counsel, as well as the authorities cited, furnish much stronger reasons for maintaining the liability of *quasi* corporations, in view of their extended privileges and powers in this country, than for the rule of non-liability contended for as to municipal corporations proper.

The line of reasoning employed, if pursued to the extent insisted upon, would compel us to decide, what may be an open question in this State, and one not presented by the record before us, viz.: whether, under the statutes of this State, a county is liable to an individual for injuries resulting to him or his property from neglect of the county authorities to repair a bridge or highway. It is sufficient to say, that we do not consider it either necessary or proper to decide that question in this case.

That *quasi* corporations, such as counties and unincorporated towns and villages, did not incur such liability by the rules of the common law, is clear from the decisions of the English courts. It is likewise true that the same rule of de-

cisions, with few exceptions, has been followed in this country as to this class of corporations.

The doctrine seems to have been first announced in the Court of King's Bench in 1788, in the case of *Russell and others* v. *The Men dwelling in the County of Devon*, reported in 2 Term Reports, 667.

The wagon of the plaintiffs was damaged in consequence of a county bridge being out of repair, and they brought suit for damages against the inhabitants of the county.

It was held that the action could not be maintained, the ground of the ruling appearing to be, that the county was not a corporation, and had no corporate fund or estate out of which a judgment for damages could be satisfied; if collected out of the private estate of one or more individuals, all the other inhabitants would be liable to contribute their respective proportions, and this would give rise to a multiplicity of suits for reimbursement; that even if the county could be regarded as a corporation, the principle that damages cannot be recovered against the corporators in their individual capacity, would prevent a recovery; also that there was no precedent for the recovery of a judgment under such circumstances, save where the Legislature had given a remedy.

We perceive nothing in the grounds assigned for denying the right of action, or in the reasoning of the Court, to warrant an inference that such an action would not lie, at common law, against a municipal corporation, as to which the obstacles mentioned in that case did not exist. The almost necessary inference, from the language of the Court, would seem to be the other way.

We have examined a number of the English cases cited in the briefs of counsel, and find that the right of action by individuals, against chartered municipal corporations, for damages sustained in consequence of a failure to repair public improvements, were usually upheld.

It was held in *Henly* v. *The Mayor of Lyme*, 5 Bingham, 91, that the corporation of the borough of Lyme, under the terms of its royal charter, was liable to an individual whose property had been damaged by an overflow of the sea, caused by the neglect of the corporation to repair certain banks, mounds and sea-walls.

Another leading English case, holding that a chartered corporation was liable for neglect to perform duties enjoined by the charter, was *Mersey Docks* v. *Gill,* and *Mersey Docks* v. *Pierce* (tried together in one action), 11 House of Lords Cases, 686.

Plaintiffs were the owners of a cargo of guano, and when the ship carrying it arrived at the port of Liverpool, in endeavoring to enter one of the docks it struck against and became imbedded in a large bank of mud which had negligently been permitted to accumulate at the entrance, and the ship and cargo were damaged in consequence.

Mr. Justice BLACKBURN delivered the joint opinion of the Judges who heard the argument, reviewed a long list of cases bearing on the questions raised, and held that defendants were liable. This opinion was approved by the House of Lords.

The basis of the recovery in these and similar cases seems to have been, that the privileges and emoluments granted by the charters constituted a consideration for the performance of the duties imposed upon the corporations, and by the voluntary acceptance of the charters, the corporations had bound themselves, in the nature of a contract, to the performance of such municipal duties.

In *Henly* v. *Mayor of Lyme, supra,* the royal charter cast upon the corporation the burden of maintaining and repairing sea-walls, and other public improvements, which formerly devolved upon the Crown. As a consideration for the performance of the duties imposed, valuable franchises and property rights were conferred upon the corporation. It was considered in that case that the acceptance of the grant was the equivalent of a contract voluntarily entered into by the corporation to make the repairs.

When the *Mersey Docks* cases, *supra,* were before the House of Lords, the Lord Chancellor, Cranworth, referred to the case of *Parnaby* v. *The Lancaster Canal Company,* 11 A. & E., 223, where it was held, that the trustees having the right by virtue of their charter, to levy tolls for their own profit, in consideration of making a dock or canal, the common law imposed upon them the duty of taking reasonable care to keep it in such repair, that those choosing to navigate it might do so without danger to their lives or property. He then stated, that the only difference between the latter case, and the appeals under

consideration, was, that the appellants here, in whom the docks were vested, did not collect tolls for their own profit, but merely as trustees for the benefit of the public; adding, "I do not, however, think that this makes any difference in principle in respect to their liability. It would be a strange distinction to persons coming with their ships to different ports of this country, that in some ports, if they sustain damage by the negligence of those who have the management of the docks, they will be entitled to compensation, and in others they will not; such a distinction arising, not from any visible difference in the docks themselves, but from some municipal difference in the constitution of the bodies by which the docks are managed."

Mr. Justice BLACKBURN, on the authority of *Coe* v. *Wise*, 5 Best & S., 440, says, of corporations like the Liverpool docks, formed for trading and other purposes, that though they act without reward to themselves, yet in their very nature they are substitutions, on a larger scale, for individual enterprise. He then lays down the following rule in respect to their liability: "We think that in the absence of anything in the statutes (which create such corporations) showing a contrary intention in the Legislature, the true rule of construction is, that the Legislature intended that the liability of corporations thus substituted for individuals, should, to the extent of their corporate funds, be co-extensive with that imposed by the general law on the owners of similar works."

The Justice further said, that if the Legislature had, by express enactment or necessary intendment, enacted that the trustees of the Liverpool docks should not be subject to such liability, it would be an end of the question; or if it were enacted that none of the revenues received should be applied to the purpose of discharging liabilities of the corporation, it would go far to show that the Legislature intended that it should not be liable. Other actions of the same character were sustained upon similar grounds.

In case of *The Mayor of Lynn* v. *Turner*, Cowper, 86, an action for damages was brought against the corporation for not repairing and cleansing a certain creek, into which the tide of the sea had been accustomed to flow and reflow. By reason of the neglect to repair, as had been the custom from time im-

memorial, the sea was prevented from flowing therein, the creek became unnavigable, and the plaintiff was obliged to carry his corn round about. The opinion of Lord Mansfield bases the liability of the corporation upon the ground of prescription, inferred from the fact that they had been accustomed to repair from time immemorial. He adds, that it might be the very condition and terms of their creation and charter.

Upon due consideration of these and other cases, we are of opinion that sufficient similarity exists in the franchises conferred upon municipal corporations by our statutes, with those granted by charter under the English laws, to bring our corporations within the rule of the common law respecting duties and liabilities.

The differences between franchises conferred by royal charter on the one hand, and by our statutes on the other, relate more to the extent of the privileges granted, than to the powers conferred.

Important powers and valuable benefits are granted in both instances, and in neither instance are they forced upon such corporations. Taking the most conservative view, they are voluntarily accepted by the citizens composing such municipal bodies.

We see no reason why these domestic organizations, upon accepting the benefits of a charter of incorporation, conferring the powers ordinarily granted over streets and bridges, should not be held to assume corresponding burdens and responsibilities in respect to them.

In this case the special charter of the city of Denver, which is very similar in its provisions to the general incorporation acts, vests the complete control and government of the city in the corporation. It is empowered to make all necessary ordinances, and to elect and appoint all necessary officers, to carry into effect the powers granted. The corporation is empowered to take, hold, possess and enjoy both real and personal property, by deed, gift, bequest or otherwise, and to sell and convey the same for the use of the city. It is empowered to sue and be sued, and ample provision is made for the raising of revenue for all purposes of the corporation. Full supervision and control is given over streets and bridges, with power "to establish, erect and keep in repair bridges;" and to establish

grades, open, alter, abolish, widen, pave, grade, or otherwise to keep the streets and avenues in repair, and to remove all obstructions, and to prevent all encroachments into or upon the same.

A strong implication arises upon the language employed in the charter, that it was the legislative intention, in conferring upon the city the full supervision and control over the streets and bridges within its corporate limits, with the means of creating a corporate fund for all necessary purposes of the corporation, that the city should assume the burden of keeping the streets and bridges in repair. If such can be said to have been the legislative intent, the liability for damages resulting to individuals from neglect to repair, logically follows, and the principle of the common law doctrine becomes applicable.

That doctrine seems, in brief, to have been, that the grant and acceptance of franchises from the government, whether by individuals or corporations, imposed upon the grantee the duty of performing all the conditions upon which it issued, whether such conditions were expressly stated in the grant, or arose by necessary implication as the consideration of the grant.

We are aware that this view is not in harmony with all the adjudications upon the subject in this country, but we believe it to be founded in sound reason and know that it has the sanction of a great preponderance of authority.

In *Weightman* v. *The Corporation of Washington*, 1 Black (U. S.), 39, which was an action brought against the corporation to recover damages for injuries sustained by the falling of a bridge constructed by the corporation, the point was raised that no action would lie at common law in such a case. Mr. Justice Clifford, in announcing the opinion of the Court, ruled against the objection, remarking: "Reference is often made to the case of *Russell* v. *The Men of Devon* (2 Term R., 667), as an authority to show that no action will lie against a municipal corporation in a case like the present; but it is a misapplication of the doctrine there laid down. Suit was brought in that case against the inhabitants of a district, called a county, where there was no act of incorporation, and the Court held that the action would not lie; admitting, however, at the same time, that the rule was otherwise in respect to corpora-

tions.   But whether that be so or not, the rule here adopted has been fully sanctioned in all the English Courts."

The rule referred to in the opinion as adopted in that case was, that when a duty was imposed upon a municipal corporation, by its charter, to keep a bridge in repair, in consideration of privileges granted thereby, the means to perform being within the control of the corporation, it became liable for damages sustained by individuals from neglect to comply with the requirement.

The only difference we observe between that case and the case at bar is, that the duty of repairing and rebuilding were there expressly enjoined by the charter, whereas they arise, as we think, by necessary implication in the present instance.

The Supreme Court of Virginia, referring to the English adjudications upon this subject, say:    "These decisions proceed on the ground that where a municipal corporation acts in the exercise of powers or the discharge of duties in nowise discretionary or governmental, but purely ministerial in their character, it incurs, like a private person, the common law liability for the acts of its servants;  and that it does not matter, as was once intimated, if there be the absence of special rewards or advantages, it being considered and allowed that such gratuitous function is to be regarded as a burthen accepted under the charter, in consideration of its privileges." *The City of Richmond* v. *Long's adm'rs*, 17 Gratt., 375.

Mr. Justice Selden, in his very able opinion in *Weet* v. *Trustees of the Village of Brockport*, 16 N. Y., 161, makes the declaration that "upon investigation it will be found that, from the earliest period of the common law, all grantees of franchises, whether individuals or corporations, have been held by a uniform and unbroken series of decisions to the strictest performance of every condition of the grant, either express or implied."

Mr. Justice Hunt, referring to the case of *City of Detroit* v. *Blackeby*, 21 Mich., 84, and other cases which hold that no such liability attaches to incorporated cities, says: "The authorities establishing the contrary doctrine, that a city is responsible for its negligence, are so numerous and so well considered, that the law must be deemed to be settled in accordance with them."   *Barnes* v. *District of Columbia*, 91 U. S., 540.

See also:  *Nebraska City* v. *Campbell*, 2 Black (U. S.), 590; *Weet* v. *Village of Brockport*, 16 N. Y., 161; *City of Dayton* v. *Pease*, 4 Ohio St., 80; *Erie City* v. *Schwingle*, 22 Pa. St., 385; *Soper* v. *Henry County*, 26 Iowa, 264; *Browning* v. *City of Springfield*, 17 Ills., 143; *Town of Waltham* v. *Kemper*, 55 Ills., 346; *City of Richmond* v. *Long's adm'rs*, 17 Gratt., 375; *Mears* v. *Com'rs of Wilmington*, 9 Iredell, 73; *Jansen* v. *City of Atchison*, 16 Kan., 358; *Smoot* v. *Mayor of Wecumpka*, 24 Ala., 112; *Grove* v. *City of Fort Wayne*, 45 Ind., 429; 2 Dill. Mun. Corp., 3d Ed., Secs. 980, 1017. The above list might be largely extended.

While the decisions of many respectable Courts are opposed to the foregoing views, we are satisfied that the rule announced for this State is a safe and equitable one. That it ought to be the law, is evident from natural reason and the plainest principles of justice. That it is the law, sufficiently appears from precedent and the decided weight of authority. Whether a logical distinction is made, by the Courts of this country, between municipal corporations and *quasi* municipal corporations, respecting the liabilities of the two classes, in view of the greater powers and privileges now conferred upon the latter class by the statutes of the several States, does not affect the question under consideration. The general current of authority supports the view, that when municipal corporations are invested with exclusive authority and control over the streets and bridges within their corporate limits, with ample power of raising money for their construction, improvement and repair, a duty arises to the public, from the nature of the powers granted, to keep the avenues of travel within such jurisdiction in a reasonably safe condition for the ordinary mode of use to which they are subjected, and a corresponding liability rests upon the corporation to respond in damages to those injured by a neglect to perform the duty. That the same rule obtains in such case, whether the duty is specifically imposed by the act of incorporation or not. This duty is municipal or ministerial, and not governmental, as asserted by appellant.

This view of the case, and the rule here announced, in nowise conflicts with the ruling referred to in *Daniels et al.* v. *City of Denver*, 2 Colo., 669. The failure or neglect there complained

of, was the failure to exercise a discretionary power conferred by the charter, to wit: The power of making sewers and drains. All Courts agree that the failure to exercise a discretionary power is not actionable. But the neglect here complained of, is to keep in repair improvements made by the city. When the power to construct such improvements is assumed, the duty to keep them in repair is fairly implied and becomes peremptory.

Common reason teaches that streets and bridges must be kept in a safe condition for ordinary use. Under the charter of this city, no one, without authority from the corporation, can in any manner interfere with its streets or bridges, either for the purpose of making repairs or otherwise. The duty of making repairs is essentially a corporate, as distinguished from a governmental duty, and it does not extend outside the corporate limits. Property within the city limits is not taxable for road purposes outside such limits.

For the reasons assigned the city must be held liable, unless the exceptions reserved by the appellant upon the trial in the District Court, and referred to by its counsel under the second head of his argument, shall disclose sufficient error to warrant a reversal.

*First*—Under the second head of the argument, it is claimed that the right of recovery was defeated by the contributory negligence of the appellee.

The general rule on this subject is, that to entitle the plaintiff to damages, he must have used reasonable or ordinary care to avoid the accident; that is, such care as is usually exercised under like circumstances, by persons of average prudence.

If the plaintiff, in his own case, shows that he brought the injury upon himself by his own carelessness, he may be non-suited; but if the defendant's failure of duty, and the injury to the plaintiff are shown, and it does not appear that plaintiff brought on the injury by his own negligence, such proof must come from the defendant. Wharton on Negligence, Secs. 423 to 427; *Mayo* v. *Boston & Maine R. R.*, 104 Mass., 137; *K. P. Ry. Co.* v. *Twombly, Adm'x*, 3 Colo., 125.

WILLIAMS, J., says, in *W. C. & P. R. R.* v. *McElwee*, 67 Pa. St., 315, "It is always a question for the jury, when the measure of duty is ordinary and reasonable care. In such cases

the standard of duty is not fixed, but variable. Under some circumstances a higher degree of care is demanded than under others. And when the standard shifts with the circumstances of the case, it is in its very nature incapable of being determined as matter of law, and must be submitted to the jury, to determine what it is, and whether it has been complied with." The following is mentioned as an exception to this rule: "When there is such an obvious disregard of duty and safety as amounts to misconduct, the Court may declare it to be negligence as matter of law."

Another Judge cites several cases as properly withdrawn from the consideration of the jury, on account of inexcusable acts appearing therein, as attempting to cross a railroad track by going between two cars in motion; leaping from a train in motion; crossing a railroad track in front of an approaching train without looking up, and the like; adding, "But in all these cases there was no dispute about the facts; nothing material was left in doubt. There was no question as to the credibility of witnesses, and nothing was left to be inferred in the way of explanation or excuse." *Brooks* v. *Somerville*, 106 Mass., 271.

In the case at bar the plaintiff's testimony had made out a *prima facie* case against the defendant, at the time the motion for nonsuit was presented. It had been shown that the appellant had permitted a bridge in one of the principal thoroughfares of the city to become unsafe for the ordinary use to which it was daily subjected; and with full notice of its unsafe condition, had failed to either properly repair it, or to give any warning of its unsafe condition; that while one of the freight teams belonging to the City Transfer Company, of which appellee was foreman, was crossing the bridge with a load of rock, of less than the ordinary weight for such teams, a wheel of the wagon crushed through the floor of the bridge, going down to the hub, and while endeavoring to pry it up, by the use of levers and fulcrums, the timbers gave way and the bridge fell to the bottom of the creek, carrying the appellee with it and breaking his leg. According to his own testimony he did not know the bridge was unsafe. He did know that the surface of the bridge was worn by the immense traffic over it, and that it would shake when a load of freight was crossing,

but did not know of the unsoundness of the frame or timbers.

It is difficult to perceive, in view of the authorities, how it could be determined, as a question of law, at the close of the appellee's testimony, that he had been guilty of contributory negligence. Such conclusion could only be reached by deciding that he did not adopt proper means to extricate the wagon. Up to that time no proof to that effect had been introduced. It could only have been inferred from the falling of the bridge. As appellee's counsel aptly say, "the very inquiry was, whether the means employed were careful and prudent, and this was a question for the jury."

It is clear that at this stage of the case no cause existed for taking the case from the consideration of the jury.

The same authorities and the same considerations demonstrate that the question of contributory negligence was properly submitted to the jury at the close of the trial, after all the testimony was in. There was then a dispute about the facts; there were questions as to the credibility of the witnesses, and the main question, whether proper measures and appliances were employed to extricate the wagon, was, we think, in doubt.

That an expert bridge builder was able to testify that the appellee was negligent, on information of the condition of the bridge and bridge timbers, and upon mathematical calculations of the amount of weight or pressure brought to bear upon one stringer of the bridge, is not conclusive.

The appellee was not an expert. He did not know as much about the strength and condition of the bridge as the witnesses did, and while it was his duty to use reasonable and ordinary care to avoid the accident, it was not necessary to suspend the work of extricating his wagon for mathematical calculations as to the strength of the bridge. The question is, whether he acted as a person of average prudence would have acted under like circumstances, and this question was properly left to the jury.

*Second*—Upon the exception reserved to the overruling of the motion for a new trial, on the ground assigned by appellant, that the damages given by the jury were excessive, many of the same principles just announced apply. The true measure of damages is, as contended for, compensatory only. But where the amount of damages does not depend on computa-

tion, as in cases for personal injuries, as we said in *Wall et al.* v. *Livezay*, 6 Colo., 465, "It is exclusively the province of the jury to estimate and assess the damages, and the amount to be allowed in such cases rests largely in their sound discretion." And, as there announced, to warrant the Court in interfering with that discretion, it must be apparent that the amount of damages given by the jury is so disproportionate to the injury received as to show that the jury were influenced by prejudice, misapprehension, or by some corrupt or improper consideration. See authorities in opinion; also *Stillman* v. *Proprietors of Canal Bridge*, 16 Pick., 541.

Where there is no fixed standard for computing the damages, but the measure thereof rests in the exercise of sound judgment and discretion, different minds are likely to arrive at different results upon consideration of the facts of a given case. The case before us furnishes an illustration of the proposition. The jury, upon consideration of the loss of time, expenses incurred, and the inconveniences and sufferings consequent upon the injury received, adjudged the plaintiff to be entitled to a certain compensation. The District Judge thought the amount awarded exceeded actual compensation by the sum of $500, and required the plaintiff to remit that sum, which was done. If the duty of assessing the damages devolved upon this Court, we might fix a still smaller sum as the result of our judgment. But this is not the test. It was the province of the jury to determine the amount, and we cannot say, as matter of law, that the amount of the judgment is so exorbitant, and disproportioned to the injuries received, as to warrant us in declaring it excessive.

*Third*—Upon the error assigned respecting the admission of improper evidence, appellant claims that error was committed in allowing the plaintiff to show, in rebuttal, a different arrangement of the blocks and lever, from that brought out in the original presentation of his case. Counsel says, that the appellant was injured by this ruling, because expert witnesses had been called by appellant, and had testified to hypothetical questions based on the facts as originally submitted, and that the admission of the testimony complained of, tended to confuse the minds of the jury as to the position of the lifting apparatus, and to weaken the effect of the expert testimony.

The order of proof specified by the Civil Code, confines the parties after the introduction of their evidence in chief, to rebutting evidence, "unless the Court, for good reasons in furtherance of justice, permits them to offer evidence in their original case." Civil Code, Sec. 168.

If by inadvertence the appellee omitted to produce, as testimony in chief, all the facts relating to the manner and means employed to extricate the wagon, the Court had the discretion to allow the omission to be supplied at a later stage of the trial. But the appellant was entitled to have its expert testimony go to the jury, upon the appellee's full case on this point. Had appellant offered to recall its experts after the admission of the new testimony, and the offer been denied, there would have been ground of complaint. But no such offer was made. The mere statement that the expert witnesses had been dismissed and could not be recalled, is not sufficient to maintain the error assigned.

The judgment must be affirmed.

*J. L. Jerome, C. W. Wright,* for appellant.

*W. S. Decker,* for appellee.

———— ▶●◀ ————

COLORADO DIGEST, comprising the Decisions of the Supreme and Federal Courts of the State, as Reported in Volumes 1 to 6 Colorado Reports, Dillon, McCrary, the Colorado Law Reporter, Denver Law Journal, and the Federal Reports, with Tables of Cases Digested and Cited. By R. S. MORRISON. DENVER: WHIPPLE & PIERSON, 1884.

The Bar of Colorado and the West is laid under additional obligations to this industrious publicist for this last product of his pen. The book is a model of its kind, and coming from Mr. Morrison, no assurance is needed of the accuracy and thoroughness of the work. It embraces all the Colorado Official Reports, as well as all the magazine and periodical publications which properly embrace this territory, complete, and will save much labor to the busy lawyer. The classification and arrangement are admirable; and the entire book is just what the profession desire. The edition is small, and will doubtless be exhausted before the demand is supplied.

Price, only $5.00; interleaved, $6.00. Sent to any address postpaid, on receipt of price, by Whipple & Pierson, Publishers, Denver.

————

THE CODE OF CIVIL PROCEDURE for the State of Colorado, with all the Amendments made prior to January 1st, 1884, including Partition and Condemnation. With Notes of the Dicisions of the Supreme Court of Colorado, and the Supreme Courts of California, New York, Ohio, Kentucky, and other States with similar Code Provisions. Edited by JAMES A. DAWSON. Denver, Colorado: TIMES STEAM PUBLISHING HOUSE. 1884.