[No. 4897.]

The Colorado Springs Electric Company v. Soper, a Minor, etc.

1. **Appellate Practice—Damages—Amount — Remittitur—Prejudice or Improper Motive of Jury.**

In an action for damages on account of injuries to a child, the jury returned a verdict for $6,000, which, upon the motion for a new trial, was by requirement of court reduced by remittitur to $4,500. Held, after reviewing the evidence, that such verdict is not so manifestly disproportionate to the injury received as to make it apparent that the jury was influenced by prejudice, misapprehension or by some corrupt or improper consideration, and therefore the appellate court is not warranted in disturbing it.—P. 133.

2. **Same—Excessive Verdict.**

In an action for damages on account of injuries to a child, the jury returned a. verdict for $6,000, which, upon the motion for a new trial, was by requirement of court reduced by remittitur to $4,500, on the ground that the jury had failed to take into consideration the fact that the amount allowed plaintiff would be placed at interest until plaintiff reached his majority, when the aggregate amount would be properly turned over to him. Held, that such reason given by the court for ordering the remittitur is not tenable, since it had no right to say what the jury did or did not take into consideration in arriving at the verdict.—P. 134.

3. **Same—Error Favorable to Appellant.**

In an action for damages the jury returned a verdict for $6,000 damages, which, upon the motion for a new trial, by requirement of court, was reduced by remittitur to $4,500. Held, that, in the absence of the jury being influenced by bias, passion, prejudice, or other improper motive, the defendant is not in position to complain, even though the court gave an erroneous reason for ordering such remittitur, since the error, if any, is prejudicial to plaintiff and not to the defendant.—P. 135.

4. **Damages—Negligence—Contributory Negligence of Parents— Care Required as to Children.**

The fact that a mother permitted her children to play out of doors in the day time, on public grounds and unattended, does not constitute negligence so as to preclude recovery for injuries to one of such children caused by a live wire left un-. guarded in a public place by defendant.—P. 136.

5. **Same—Instructions.**

In an action for damages on account of injuries to a child, the evidence showed that the day following the shock occasioned by plaintiff's coming in contact with defendant's barb wire, which was charged with electricity, and as soon as it was discovered. that the result of the shock might become serious a competent physician was called in, who treated the child from then to date of trial, and a few days later another competent physician was called in consultation and again later. Held, that such facts do not show negligence upon the part of the parents, and the court properly refused a tendered instruction to the effect that if the parents were negligent in failing to provide proper medical attention and that such negligence contributed to the injuries complained of, plaintiff could not recover.—P. 136.

6. **Appellate Practice—Damages—Instructions—Failure to Give, Favorable to Appellant.**

In an action for compensatory damages only for injuries to a child, caused by defendant negligently leaving a live wire unguarded in a public place, the court's refusal to instruct that the plaintiff was not entitled to recover exemplary damages unless the negligence of the defendant was willful, malicious or wanton, was a ruling favorable to defendant, of which he cannot complain, for the plaintiff, not having asked for exemplary damages, could not recover them; and if such instruction had been given, the jury could well have felt that it was at liberty, in accordance with the evidence introduced, to find that defendant's negligence amounted to wantonness, and accordingly render a verdict for exemplary damages, which would not have been warranted under the pleadings.—P. 137.

7. **Damages—Electric Plants—Care Required—Instructions.**

In an action for damages on account of injuries caused by a live wire, an instruction is proper which charges the jury that one who is engaged in a business requiring the generation and transmission of electricity is bound to exercise the highest skill, care and caution, and the utmost diligence and foresight in the construction, maintenance and timely inspection of its entire plant, which is attainable, consistent with the proper conduct of its business, according to the best known methods of the state of its art prior to the disaster; and the use of the word "disaster" therein instead of "accident," or some other similar term, is not erroneous, inasmuch as the fact of the child being injured by coming in contact with defendant's electrified wire is not disputed, and under the evidence the accident might well have been termed disastrous.—P. 138.

8. **New Trials — Grounds — Newly Discovered Evidence — Due Diligence.**

Alleged newly discovered evidence is not ground for a new trial on motion of defendant, where the affidavits of the fact sought to be proved were made by three witnesses, two of whom were related to and living in the home of the superintendent of defendant company, and where the person injured had lived in a thickly settled community for a long time prior to the injury received, so that defendant had ample opportunity to prove the matter desired, if true.—P. 140.

*Appeal from the District Court of El Paso County.*
*Hon. Louis W. Cunningham, Judge.*

Action by Donald C. Soper, a minor, by James C. Soper, his father and next friend, against The Colorado Springs Electric Company. From a judgment for plaintiff, defendant appeals.

*Affirmed.*

Messrs. Hall, Babbitt & Thayer, and Mr. F. L. Sherwin, for appellant.

Mr. Geo. W. Musser, for appellee.

Mr. Justice Bailey delivered the opinion of the court:

At the time of the injury complained of, plaintiff was a child five years of age. The defendant was a corporation engaged in operating an electric plant in the city of Colorado Springs, used for the purpose of generating and transmitting electricity. It appears that, previous to the injury, a barbed wire had been stretched along the tops of the poles used by defendant. It had broken at a point west of where the accident occurred, and remained attached to the poles to the east. The loose end hung down through or across the other wires of defendant, and crossed a span wire of the street railway company, thence to the street known as Pike's Peak Avenue, where, from thirty to fifty feet, as estimated by the witnesses, lay coiled up in the grass and partly hidden, and covered a considerable space of ground. This wire had been hanging down in the street for nearly four months before the accident.

On the afternoon of the 27th of August, 1902, the mother of plaintiff and his twin sister permitted the children to go out to play with others upon the grounds of the school for the deaf and blind, which was near the residence of plaintiff's parents. One of the employees of the school was engaged in hauling earth, and the children asked permission to ride in his wagon. He took them to the place where he

obtained the earth, lifted them out of the wagon, and told them to sit upon the bank of earth near which he was loading his wagon. They soon became engaged in play, and came in contact with the barbed wire, which was then charged with electricity. The teamster and another employee of the institution extricated the children from the wire, but not until they had been cut and scratched by the wire, and burned and shocked by the electricity.

A physician was called by the parents, and the children received medical attention until the time of the commencement of this action, upon the 8th day of August, 1903.

As a result of the trial, the jury returned a verdict for plaintiff in the sum of $6,000. A motion for a new trial was made, and the court required plaintiff to elect whether he would file a remittitur of $1,500 from the verdict of the jury, or have the defendant's motion for a new trial sustained. Plaintiff elected to file the remittitur, but objected and excepted to the order of the court requiring him to so elect. Judgment was then rendered in favor of the plaintiff for the sum of $4,500. This occurred upon the 27th of June, 1904. Defendant prayed an appeal upon the same date, and upon the 30th of June, and before the appeal was perfected, the court, in the presence of the attorneys, plaintiff and defendant, ordered the clerk to add to the order denying defendant's motion for a new trial the following findings of fact, being the grounds upon which the order was made, although at that time not made a part of the record, which findings of the court were the basis and reason for requiring a remittitur to be filed as a condition precedent to the denial of defendant's motion for a new trial, namely:

"First. That the court finds no evidence that bias, prejudice or passion in any manner affected the

minds of the jurors in the consideration of the case, nor did the same enter into or affect their verdict.

"Second.   That the jury did not take into consideration and properly weigh the fact that the amount allowed the plaintiff by its verdict would or should, when paid, be placed at interest until the plaintiff reached his majority, when the aggregate sum would be properly turned over to him."

The first contention of appellant is, that the damages awarded plaintiff were and are excessive, and appear to have been given under the influence of passion and prejudice.

It appears from the testimony that, previous to the accident, plaintiff was in good health; that he was a stout, healthy boy; that he slept naturally at night, went to bed tired, and slept until he was called in the morning.   He played like other healthy four or five-year-old boys; his eyes appeared to be perfect; there was nothing noticeable about them that had attracted the attention of a physician who was visiting at the family residence upon professional business.   Another physician who was called to attend one of the children for typhoid fever previous to the accident says that this boy was in very fair health.   He noticed nothing that would attract his attention to anything to the contrary.

Since the injury complained of, according to the testimony of plaintiff's witnesses, there has been a general decline in his health, he is gradually getting worse, his health has not been good since that time, he has been constantly under the care of a physician, he does not sleep well.   Up to the time of the trial, there has not been a single night that he would not call out in his sleep or waken very much frightened. He would only play occasionally, and would soon become tired, and walk with a heavy, dragging motion.   Previous to the accident, his appetite was

good. After that it was variable, sometimes he refused to eat. There was some defect in his eyes, which was attributed by some of the physicians to the injury. While previous to the accident he was calm and playful, after that time he was extremely irritable. It was stated that he could scarcely see out of one of his eyes, and very poorly out of the other; it was slightly drawn, and affected with a nervous twitching. He fell off in flesh. Previous to the injury, he was rosy-cheeked. Up to the time of the trial, he was pale and depressed. He was suffering with a trouble that the physicians called mal-assimilation—that is, the food was not properly assimilated, and he was under-nourished. This change in the condition of plaintiff is attributed, by the physicians called by him, to the shock produced by the electricity.

On the other hand, the physicians called by defendant say that this condition is not strange; that it is a common occurrence; that it is temporary; that the difficulty with the eyes was congenital—that is, due to some condition existing prior to the birth of the child—and that all of this nervousness, mal-assimilation and other illness with which plaintiff seemed afflicted was occasioned by this affection of the eyes, and, in any event, the condition is only temporary.

To make a long story short, this case is but an example of the usual one in which expert witnesses are called. Those called by the plaintiff find that the condition is serious, that the term of its continuance cannot be determined, that it results from the injury occasioned by the accident; while witnesses called by the defendant say that the condition is not serious, that it is owing to some cause other than the shock (in this case they attributed it to a congenital disease of the eye, and insist that it will be of short

duration, although the inference to be drawn from their testimony is that the eye, unless treated, will continually grow worse).

The defendant does not suggest any facts that will warrant the inference that the verdict was influenced by passion, prejudice or other improper motive, except that the verdict was larger than defendant thinks is warranted by the testimony. In cases of this character, the law does not warrant us in disturbing the verdict, unless the amount of damages allowed is so manifestly disproportionate to the injury received as to make it apparent that the jury was influenced by prejudice, misapprehension, or by some corrupt or improper consideration. It is the province of the jury to estimate and assess the damages, and the amount to be allowed in such cases as this rests largely in its sound discretion.— *Denver v. Stein,* 25 Colo. 125; *Wall v. Livezay,* 6 Colo. 465; *Denver v. Dunsmore,* 7 Colo. 328.

We are unable to find anything in the record which warrants us in asserting that the jury was influenced either by prejudice or any other corrupt or improper motive. It is one of those cases in which different juries might honestly differ as to the proper amount of a verdict.

The second contention of defendant is, that the court erred in directing the plaintiff to file a remittitur, or, in default thereof, a new trial would be granted. Defendant relies upon *The F. M. Davis Iron Works Co. v. White,* 31 Colo. 82. What we said in that case is as follows:

"The result of our conclusion is—and that is the only point which we decide—that, under our code, where, in an action for personal injuries and others standing on like grounds, the verdict is excessive, and is returned as the result of passion or prejudice upon the part of the jury, it should be set

aside in its entirety and a new trial awarded, and that it is beyond the power of a trial court to order a remittitur as to the part which it deems excessive, and enter judgment for the residue, because the entire verdict is vitiated by the improper motive, and it is impossible for the court to determine that any particular part is free from objection and some other part is bad.''

That is as far as we have gone in the matter. To bring the case within this rule, two elements must be present: First, an excessive verdict, and, second, the influence of passion or prejudice. If either of these are absent, and no improper motive is shown, the case is not within the rule. The record in this case and the findings of the trial judge stamp it as an honest verdict, free from the influence of passion or prejudice. Where the trial court, who has had the advantage of hearing the trial of the case, observing the conduct and disposition of the jurors and the manner in which the testimony was received by them, finds, as a matter of fact, that the jury was not influenced by passion or prejudice, and there is nothing in the record to the contrary, we have no right to assume that it was so influenced. If, notwithstanding the fact that the trial court believes that the jury was actuated only by honest motives, it still believes that the verdict was excessive, and orders a remittitur for such an amount as it believes was excessive, this does not vitiate the entire verdict, and does not injure the defendant. The party injured, if any, is the plaintiff, who was entitled to a judgment for the amount of the verdict, unless the same is clearly excessive, or was rendered from improper motives.

The reason given by the court for ordering a remittitur in this case is not tenable. It had no right to say what the jury did, or what it did not take

into consideration in arriving at its verdict. So, we determine in this case that, where the record fails to disclose anything which shows or tends to show that the jury was influenced by bias, passion, prejudice or other improper motive, and where the court finds, as a matter of fact, that it was not so influenced, yet, notwithstanding the condition of the record, and notwithstanding such findings of fact made by the court, the court orders a remittitur of a portion of the verdict, the defendant is not in a position to complain, even though the court gives an erroneous reason for ordering such a remittitur. The error, if any, is prejudicial to the plaintiff, and not to the defendant.

Numerous cases have been determined by this court where the ordering of a remittitur has been acquiesced in. In the Davis case, these cases are cited. There will also be found in the Davis case a review of the authorities and decisions by other courts concerning the matter. It will serve no useful purpose to again call attention to these authorities.

The third contention of defendant is, that the court refused to give certain instructions requested by it to the jury. The proposition conveyed by the instructions is, that negligence of a parent or other person standing *in loco parentis* of a child of tender years, contributing to an injury, is imputable to the child, and will prevent a recovery by such child. The authorities upon this principle are in serious conflict, but, in this case, it is unnecessary to determine whether the principle is supported either by the weight of authority or the weight of reason, because there is no evidence of contributory negligence upon the part of the parents or any other person standing *in loco parentis*. There can be no contributory negligence, unless there is negligence of some sort. In

this case, the mother permitted the children to play with other children upon the grounds of the deaf and blind institute, situate near the home of the children's parents. While playing there, they were permitted by Mr. Jones to ride in his wagon a couple of blocks to where he was getting earth. He took them out of the wagon, in order to load it, and set them down on the bank and told them to stay there. They were near him and Mr. Dunman, another employee of the institute. They were away from the traveled portion of the street, safe and secure from all dangerous things rightfully on the street. The barbed wire charged with electricity had no right to be there. If parents are negligent in permitting children to play out of doors, on public grounds in the day time, unattended by the parents themselves or others, then, in the majority of cases, it will be necessary to go out of the business of rearing or attempting to rear children, because parents cannot be with children at all hours of the day; neither is it practicable to employ others to be with them to guard them against unseen dangers. The parents had no occasion to believe that defendant company would be so careless and grossly negligent, and so wantonly regardless of the safety of others, as to permit one of its wires to be lying around in the grass charged with electricity, menacing the lives of those who might touch it. It was perfectly natural for the mother to permit the children to play in the daytime. There is nothing in the testimony to warrant the instruction tendered by defendant as to the contributory negligence of parents:

Appellant contends that the court erred in refusing to give the second instruction requested by it. The effect of this instruction is, that it is the duty of parents to protect and care for their young children, and to see that they have proper medical

attendance, and if the parents were negligent in the care of plaintiff, in providing proper medical attendance, and that this negligence contributed to the injuries complained of, then such negligence is attributable to the plaintiff, and he cannot recover in this action.   This instruction embraces the doctrine that the negligence of the parents is imputable to the child in cases where the child has been injured. In this particular case we do not feel that it is necessary to determine the question as to whether or not the negligence of the parent is imputable to the child, for the reason that the proof shows that, the day following the shock occasioned by the plaintiff's coming in contact with the defendant's barbed wire which was charged with electricity, and as soon as it was discovered that the result of this shock might prove serious, the parents of plaintiff called Dr. Casely, who appears to have been a competent physician, and this doctor attended the plaintiff from that time until the date of the trial. Dr. Smith, who also appears to have been a competent physician, was called in consultation a few days after the accident, and again later.   There is no contention that these physicians were not qualified.   There is no contention that the boy was not properly treated, and it is not error on the part of the court to decline to give an instruction which is not pertinent to any of the facts before the jury.   Where the parents have exercised reasonable care, as is conclusively shown in this case, it would be error for the court to instruct the jury that the sins of the father and mother should be visited upon the head of the child. The negligence of the parents cannot be imputed to the child, unless there is negligence to impute.

Defendant requested the court to instruct the jury that the plaintiff was not entitled to recover exemplary damages unless the negligence of the de-

fendant was willful, malicious or wanton. The plaintiff did not seek to recover exemplary damages. The suit was for compensatory damages only. If the court had given the instruction requested, the jury could well have felt that it was at liberty to determine that the defendant, in leaving this barbed wire lying by the roadside where children might easily become entangled in its meshes, with the danger of its becoming charged with electricity existing, was so regardless of the safety of others as to amount to wantonness, and accordingly render a verdict for exemplary damages, which would not have been warranted under the pleadings. The plaintiff was in no position to recover such damages, because he did not ask for them, and the pleadings were not based upon the provision of the law authorizing them. Instead of complaining of the action of the court in refusing this instruction, the defendant should be gratified because the trial court saved it from itself.

Defendant complains because the court refused to instruct the jury that, if it believed from the evidence that the defendant had exercised the usual and customary care and precaution which its experience had demonstrated to be necessary and sufficient, and that the accident could not have reasonably been foreseen or prevented by any precaution taken by the defendant, plaintiff could not recover. The court, instead of so instructing the jury, instructed it that one who is engaged in a business requiring the generation and transmission of electricity is bound to exercise the highest skill, care and caution, and the utmost diligence and foresight in the construction, maintenance and timely inspection of its entire plant, which is attainable, consistent with the proper conduct of its business, according to the best known methods of the state of its art prior to the

disaster. The defendant complains bitterly because the instruction tendered by it was refused and the other given, and relies on the case of *The Denver Electric Co. v. Lawrence,* 31 Colo. 301, in which it appears that an instruction similar to the one requested by defendant had been requested at the trial and was refused, and this court held that the propositions stated were in effect given in instruction No. 7 offered by defendant in that case, without expressing an opinion as to the correctness of the instruction; but, on page 311 of vol. 31, in discussing the duty of the electric company, we said:

"Moreover, the court, in other instructions, correctly declared that the defendant was bound to exercise the highest skill, most consummate care and caution, and utmost diligence and foresight in the construction, maintenance and timely inspection of its entire plant, which was attainable, consistent with the practical conduct of its business according to the best known methods of the state of its art and prior to the time of the disaster."

Which is, in effect, that which the court instructed the jury in this case, and is also the doctrine announced in the case of *Denver Consolidated Electric Co. v. Simpson,* 21 Colo. 371.

The defendant further quarrels with the trial court because this instruction contains the word "disaster" instead of "accident," or some other similar term. In the Century Dictionary the definition of the word "disaster" is: "Misfortune, mishap, calamity; any unfortunate event, especially sudden or great misfortune; a word used with much latitude, but most appropriately for some unseen event of a very distressing or overwhelming nature." Inasmuch as the fact that the child was injured by coming in contact with defendant's electrified barbed

wire is not disputed, we do not see that the court can
be complained of to much advantage because it saw
fit to name this action a disaster in place of calling it
a misfortune, or mishap, or calamity, or catastrophe,
or any of the other synonyms which might be suit-
able.  If the child was changed from a robust, rosy-
cheeked, playful, healthy boy, to a pale, emaciated,
poorly-nourished, nervous, fretful, cross-eyed and
diseased wreck by reason of this shock, as was shown
by the testimony of some of the physicians and the
mother, and as, judging from the verdict, the jury
must have believed, the accident might well have
been termed disastrous.

Defendant further contends that it should have
had a new trial, on the ground of newly discovered
evidence.   The newly discovered evidence consisted
of affidavits made by Frances Capell, Belle Kennedy
and Florence Kennedy, to the effect that they were
acquainted with plaintiff previous to the accident,
and that his eyes appeared to be affected before that
time.   The counter-affidavit shows that, at the time
of the injury and for a long time prior thereto, the
plaintiff, with his parents, lived in a thickly popu-
lated portion of the city of Colorado Springs, with
numerous neighbors and friends living about them,
and there was ample opportunity for defendant com-
pany to ascertain the condition of the plaintiff and
of his health and body prior to the date of the acci-
dent; that Belle Kennedy was the wife of Donald
Kennedy, who is the superintendent of defendant
company and has been for several years; that Flor-
ence Kennedy is also related to Donald Kennedy,
and resides in his home.   So that, so far as the testi-
mony of these two witnesses is concerned, it might,
by the exercise of trifling diligence, have been se-
cured at the time of the trial.

Perceiving no error in the record which would warrant a reversal of the judgment, it is hereby affirmed.                                                    *Affirmed.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE GODDARD concur.