No. 12,587.

BLANKETTE ET AL. *v.* PUBLIC SERVICE COMPANY
OF COLORADO.
(10 P. [2d] 327)

Decided March 28, 1932.

Messrs. MORRISSEY, MAHONEY & SCOFIELD, Mr. HAROLD G. KING, for plaintiffs in error.

Messrs. GOSS & HUTCHINSON, for defendant in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

IN an action brought by Peter and Leah Blankette against the Public Service Company of Colorado, the trial court granted the defendant's motion for a nonsuit, and thereupon dismissed the action. To the judgment of dismissal the plaintiffs sued out this writ of error.

The plaintiffs sued for damages for the destruction of their dwelling house by fire, caused, they say, by negligence on the part of the defendant.

The evidence was to the following effect: The defendant furnished electricity to light the plaintiffs' dwelling house near Louisville. The current was carried from the

defendant's transmission line by means of two service wires running from a pole in front of the house to the northeast corner of the house, to which the wires were attached by means of wooden pegs capped with glass insulators; thence the wires went into the attic, thence down through the attic floor to an electric meter, and from the meter, through a fuse box, to the various rooms in the house. When they were installed, the wires were placed about thirteen inches apart where they entered the house and about four inches apart where they "came down to the meter." The meter, and the wires from the pole to the meter, were installed by the defendant. The wires from the meter to the several rooms were installed by an electrician employed by the plaintiffs.

About 10 o'clock in the morning of March 25, 1928, during a severe windstorm, which commenced an hour before, a transmission line pole next to the one in front of the house was broken off at the base. The pole was old and "practically all rotten." After breaking, it was held suspended by the wires and swayed back and forth, causing the pole in front of the house to move, thereby throwing a strain on the two service wires running to the house. The pull on the wires was so strong that it caused the meter to move. At the same time there was heard a "pulling and breaking noise" in the corner where the wires went into the attic. That noise continued until the fire was discovered, at about 2 o'clock in the afternoon. The electric lights in the house would burn at 10 o'clock in the morning, but would not burn at 11 o'clock, although at that hour the neighbors' electric lights would burn. The electrician who did the wiring for the plaintiffs testified that he installed the wiring and fixtures in the way that they should have been installed. The only stove that connected with the chimney was in the kitchen. There had been no fire in the stove since about 6:30 o'clock in the morning, which was long before the wind arose. The fire that destroyed the house did not start near the chimney, but at the place where

the defendant's wires entered the attic. The chimney was of brick and was newly plastered in 1923. There was no lightning that day, and there was no other fire in the neighborhood, except one caused by sparks or brands from the plaintiffs' burning house. The plaintiffs had never had any trouble with the electricity until the house caught fire. The plaintiffs did not know whether or not, when the fire started, the wooden pegs were still fastened to the house, or whether or not, at that time, the wires were still fastened to the glass insulators. The electrician testified that if there had been a short-circuit along the line of the wires installed by him for the plaintiffs, the fuse would have melted, thereby breaking the current, and no fire would have resulted; whereas if the short-circuit occurred on the other side of the fuse box, that is to say, along the line of the wires installed by the defendant, it probably would have burned one of the wires in two. He also testified concerning short-circuits being caused by contact between two wires from which the insulation has been scraped off, and by ends of broken wires coming in contact with each other. He also testified to the tendency of wires to break under strain.

█ 1. The plaintiffs offered to prove by the electrician the following matters: That where insulated wires are broken, the bare ends coming in contact with each other will cause an arc of intense heat, which in turn coming in contact with any inflammable substance, will cause a fire; that friction of insulated wires caused by the insulation rubbing against wood would tend to wear off the insulation so as to leave the bare wires exposed, so that such broken ends, coming in contact with each other, would create, or tend to create, an electric arc, which, coming in contact with wood or other inflammable substance, would start a fire, or would probably start a fire. The court sustained an objection to the offer. This was error. The offered evidence should have been received.

██ 2. A person is bound to exercise that reasonable care and caution that would be exercised by a rea-

sonably prudent and cautious person in the same or similar circumstances. The care required increases as the danger does. In view of the dangerous character of the defendant's business, it was the defendant's duty to exercise, for the protection of others, the highest degree of care that skill and foresight can attain consistent with the practical conduct of the business under known methods and the present state of the business. *Denver Consolidated Electric Co. v. Simpson,* 21 Colo. 371, 41 Pac. 499; *Denver Consolidated Electric Co. v. Lawrence,* 31 Colo. 301, 73 Pac. 39; *Colorado Springs Electric Co. v. Soper,* 38 Colo. 126, 88 Pac. 161; *Arkansas Valley Railway, Light & Power Co. v. Ballinger,* 65 Colo. 548, 178 Pac. 566. That rule applies to the maintenance and inspection of its entire plant, including its poles and its transmission and service wires.

3. No witness swore that he actually saw that the insulation on the defendant's service wires was worn off by friction, or that the wires were broken by the strain, or that uninsulated part of the wires, in contact with each other, came in contact with the wood in the attic. But it is permissible to reason from effect to cause as well as from cause to effect. A testifies that he saw B pointing a pistol at C, saw a flash from the pistol, heard the report, and saw C fall mortally wounded with a bullet hole in his breast. The witness did not see the bullet leave the pistol, but the jurors are permitted to infer from the presence of the bullet in C's body, the flash and the report that the bullet came from A's pistol. The witness did not see A's finger actually come in contact with the trigger of the pistol, but the jurors are permitted to infer such contact from the flash and the report.

The plaintiffs' testimony excluded practically all conditions that could reasonably account for the fire, excepting those only from which, in the absence of an explanation by the defendant, the jury would be justified in finding negligence on the part of the defendant. The

evidence established a prima facie case. The court erred in granting a nonsuit and in dismissing the case.

The judgment is reversed, and the cause is remanded for a new trial.

MR. JUSTICE MOORE did not participate.