Laura SMITH, Wanda Smith and
Jeanette Smith, Petitioners,

v.

HOME LIGHT AND POWER COMPA-
NY, a Colorado corporation,
Respondent.

No. 85SC39.

Supreme Court of Colorado.

March 30, 1987.

Gerash, Robinson, Miller & Miranda, P.C., Scott H. Robinson, Denver, for petitioners.

Houtchens, Houtchens and Daniel, Kim R. Houtchens, Greeley, Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Denver, for respondent.

LOHR, Justice.

In *Smith v. Home Light & Power Co.*, 695 P.2d 788 (Colo.App.1984), a divided panel of the Colorado Court of Appeals affirmed a partial summary judgment entered by the Weld County District Court in favor of defendant Home Light and Power Company (Home Light and Power) and against the plaintiffs, Laura, Wanda, and Jeanette Smith. The partial summary judgment related to the plaintiffs' claim that an overhead power line system designed and constructed by Home Light and Power was defective and unreasonably dangerous and that the utility was liable for the wrongful death by electrocution of plaintiffs' decedents under a theory of strict products liability as set forth in the *Restatement (Second) of Torts* § 402A (1965). The court of appeals, with one judge dissenting, affirmed the partial summary judgment. We granted the plaintiffs' petition for certiorari in order to determine whether the transmission of electricity through high voltage overhead power lines constitutes the sale of a product so as to subject the supplier of electricity to strict liability in tort under the *Restatement (Second) of Torts* § 402A (1965). We hold that it does not and we therefore affirm.

I.

The facts pertinent to the issue before us are not in dispute.[1] Sidney Smith was the manager of a Weld County dairy farm owned by Delbert Henry. Smith and his son, Thomas, were killed on March 19, 1977, when they and a companion pulled a portable grain auger into a high voltage overhead power line designed, constructed and maintained by Home Light and Power and located within the farmyard. The uninsulated, 7200-volt power line had been installed in response to Henry's request that power be supplied to a dairy barn located on the farm.[2] At a point near the barn, the line was connected to a transformer which reduced the voltage to the 120/240 volts suitable for use in the dairy barn.

The plaintiffs, the wife and daughters of Sidney Smith, sought damages for the wrongful death of Sidney and Thomas Smith. See § 13–21–202, 6 C.R.S. (1973). They asserted claims against Home Light and Power based on simple negligence, strict products liability (*see Restatement*

---

1. It is unclear from the record exactly what factual materials were before the trial judge when he ruled on the motion for summary judgment. The facts stated here are gleaned from the entire record and are not disputed. The plaintiffs do not contend that summary judgment was precluded because of a genuine issue of material fact. Instead, they argue only that the trial court and the court of appeals adopted and applied erroneous principles of law.

2. The line was installed by Home Light and Power pursuant to an Electric Line Extension Contract with Henry whereby Home Light and Power agreed to extend its electric distribution system to supply the service desired by Henry, and Henry in turn agreed to pay for the electricity used, with the stipulation that the payment would not be less than $17.50 per month.

*(Second) of Torts* § 402A (1965)),[3] and abnormally dangerous activity *(see Restatement (Second) of Torts* §§ 519, 520 (1965)). The plaintiffs also asserted a claim against the manufacturer of the grain auger based on strict products liability. Prior to trial, Home Light and Power moved for summary judgment on the strict products liability and abnormally dangerous activity claims against it. The trial court granted the motion for summary judgment. The case was tried to a jury on the negligence claim against Home Light and Power and the strict products liability claim against the manufacturer of the grain auger. Prior to closing arguments, the plaintiffs reached a settlement with the manufacturer of the grain auger. Therefore, the case was submitted to the jury on only the negligence claim against Home Light and Power. The jury returned a verdict in favor of Home Light and Power, finding that Sidney Smith was the sole negligent actor. The plaintiffs subsequently appealed the trial court's decision granting summary judgment for Home Light and Power on the strict products liability claim.[4]

A panel of the court of appeals affirmed, with one judge dissenting. The court held that although electricity is a "product" within the meaning of the *Restatement (Second) of Torts* § 402A (1965) (hereinafter referred to as "§ 402A"), an electrical distribution system, of which overhead power lines are a part, is a "service" rather than a "product" and that the plaintiffs therefore had not stated a claim for relief under § 402A. *Smith v. Home Light & Power Co.,* 695 P.2d 788, 789–90 (Colo.App. 1984). Judge Tursi dissented. He would have denied summary judgment because of his conclusions that the distribution system is also a "product" and that issues of material fact therefore remained to be resolved by a jury.

The plaintiffs filed a petition for certiorari with this court. We granted the petition on the issue of whether the transmission of electricity through overhead power lines constitutes the sale of a product so as to subject the supplier of electricity to strict liability in tort under § 402A. We hold that strict products liability is not applicable to the transmission of electricity through high voltage overhead power lines, and we therefore affirm the judgment of the court of appeals.

## II.

### A.

In *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975), we expressly adopted the doctrine of strict products liability as set forth in § 402A. *Accord, e.g., Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 589 (Colo.1984); *Anderson v. Heron Engineering Co., Inc.,* 198 Colo. 391, 394 n. 1, 604 P.2d 674, 676 n. 1 (1979). Section 402A provides:

**§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer**

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

**3.** As developed in their argument to the trial court, the plaintiffs asserted in support of their strict products liability claim that the overhead power line crossing the farmyard was defective and unreasonably dangerous because it was uninsulated, improperly designed, and was not accompanied by any warnings of the dangers associated with high voltage power.

**4.** The plaintiffs did not appeal the trial court's decision granting summary judgment in favor of Home Light and Power on the abnormally dangerous activity claim. *See Restatement (Second) of Torts* §§ 519, 520 (1965). Therefore, we need not consider whether the trial court acted properly in granting summary judgment in favor of Home Light and Power on that claim.

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■ Principles of modern strict products liability law evolved in part to motivate manufacturers to use information that they can obtain through design, testing, data analysis and inspection to correct hazards in products and thereby combat the massive problem of accidents resulting from defective products. *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 218 (Colo.1984). Therefore, strict products liability under § 402A

> does not rest upon negligence principles, but rather is premised on the concept of enterprise liability for casting a defective product into the stream of commerce.... Thus, the focus is upon the nature of the product, and the consumer's reasonable expectations with regard to that product, rather than on the conduct either of the manufacturer or of the person injured because of the product.

*Jackson v. Harsco Corp.*, 673 P.2d 363, 365 (Colo.1983) (citations omitted). *Accord Blueflame Gas, Inc.*, 679 P.2d at 589.

### B.

This is our first occasion to consider the applicability of § 402A to the transmission and distribution of electricity. Courts in many other jurisdictions, however, have addressed this question, and we find guidance in the decisions of those courts. We begin our task by considering whether electricity itself can be the subject of products liability under § 402A. We then give attention to the question of whether the transmission and distribution facilities, considered either in isolation or taken in combination with the electricity that they carry, can provide the foundation for a strict products liability claim.

### 1.

Courts that have addressed the issue have almost uniformly rejected the argument that electricity by its intrinsic nature cannot be a "product" within the meaning of § 402A. *E.g., Pierce v. Pacific Gas & Electric Co.*, 166 Cal.App.3d 68, 212 Cal. Rptr. 283, 289–91 (1985); *Hedges v. Public Service Co.*, 396 N.E.2d 933, 935 (Ind.Ct. App.1979); *Petroski v. Northern Indiana Public Service Co.*, 171 Ind.App. 14, 354 N.E.2d 736, 747 (1976); *Williams v. Detroit Edison Co.*, 63 Mich.App. 559, 234 N.W.2d 702, 705 (1975); *Aversa v. Public Service Electric & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 979–80 (Law Div.1982); *Houston Lighting & Power Co. v. Reynolds*, 712 S.W.2d 761, 766 (Tex.Ct.App. 1986); *Ransome v. Wisconsin Electric Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641, 643 (1979). *See also Genaust v. Illinois Power Co.*, 62 Ill.2d 456, 343 N.E.2d 465, 469 (1976) (court assumed for purposes of argument that electricity is a "product" within the meaning of § 402A); *Schriner v. Pennsylvania Power & Light Co.*, 348 Pa.Super. 177, 501 A.2d 1128, 1133–34 (1985) (electricity becomes a product when it passes through customer's meter). *But see Farina v. Niagara Mohawk Power Corp.*, 81 A.D.2d 700, 438 N.Y.S.2d 645, 646–47 (1981) (suggesting, but not deciding, that electricity is not a "product" within the meaning of § 402A).

Home Light and Power argues that since electricity is not tangible, it is not a "product." "The courts, however, have not dwelled unduly on electricity's physical properties." *Pierce*, 212 Cal.Rptr. at 290. The Supreme Court of Wisconsin, in *Ransome v. Wisconsin Electric Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641 (1979), explained why electricity is a "product" within the meaning of § 402A:

> While there probably are numerous technical definitions of "electricity," we need not be concerned with those accurate descriptions here—suffice it to say it is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce. The distribution might well be a service but the electricity itself, in the contemplation of the ordinary user, is a consumable product.

*Id.*, 275 N.W.2d at 643. *Accord Pierce*, 212 Cal.Rptr. at 290–91. We agree with this reasoning.

Even though the intrinsic characteristics of electricity do not preclude its characterization as a product, at least one court has held that it is not a product until it passes through a customer's meter. *Schriner v. Pennsylvania Power & Light Co.*, 501 A.2d at 1134. This holding recognizes that only when the electricity reaches a point where a consumer is expected to put it to use is it anticipated to possess characteristics making it suitable for such use. More commonly, courts have addressed this concern by holding that the product has not been "sold" or otherwise "placed in the stream of commerce"[5] for purposes of § 402A until it reaches the point where it is to be used by a consumer. *E.g., Pierce,* 212 Cal.Rptr. at 292; *Hedges,* 396 N.E.2d at 935; *Petroski,* 354 N.E.2d at 747; *Genaust,* 343 N.E.2d at 470; *Williams,* 234 N.W.2d at 707; *Aversa,* 451 A.2d at 979–80; *Kemp v. Wisconsin Electric Power Co.,* 44 Wis.2d 571, 172 N.W.2d 161, 166 (1969). *Contra Houston Lighting & Power Co. v. Reynolds,* 712 S.W.2d 761, 766–67 (Tex.Ct.App.1986) (electricity in stream of commerce while still in transmission lines). These same cases base this conclusion on the observation that until arriving at the point where the electricity is made available for use by the consumer, the electricity is still in the control of the supplier and is in an unmarketed and unmarketable state.

■ We hold that at least until the electricity reaches a point where it is made available for consumer use, it is not a "product" that has been "sold" or otherwise "placed in the stream of commerce" for the purpose of strict products liability under § 402A. Only at that point has the utility company released control over electricity that is expected to have been reduced to marketable voltage.

The plaintiffs argue, however, that the electricity was released into the stream of commerce when it left Home Light and Power's roadside transmission lines and entered the distribution line that terminated at the dairy barn. We think not. The distribution line was owned by Home Light and Power and located on that company's easement. More importantly, the electricity was not contemplated for use by the consumer until the voltage had been reduced by the transformer near the barn. It cannot be maintained that the electricity with which the grain auger came in contact was sold to the consumer or released into the stream of commerce since it had not yet passed through Home Light and Power's transformer for the purpose of reducing the 7200–volt power to a level suitable for use in the dairy barn.

We believe that this reasoning is consistent with the logic underlying strict products liability. The following example illustrates our point.

> Suppose an analogous utility, a water utility, constructs a dam for the storage of water. Some years later a boy walks on part of the dam and falls into the water and drowns. Certainly, the stored water is the utility's "product" when it reaches the consumer. But it is not rational to call the stored water into which the boy fell a product "in the stream of commerce" merely because it probably will be a product at some time in the future. The water was not intended for use in this manner; indeed, it was not being used at all. Hence, any action filed against the utility would have to be based on [a negligence theory].

Comment, *Torts of Electric Utilities: Can Strict Liability Be Plugged In?,* 11 Loy.L. A.L.Rev. 775, 792 (1978) (hereinafter referred to as "Comment, *Torts of Electric Utilities* "). Therefore, strict products liability under § 402A predicated on the electricity itself is not applicable to electricity that is contacted while in a high voltage overhead power line.

2.

The plaintiffs, however, based their § 402A claim on an allegation that the "electrical system at the Delbert Henry

5. In Colorado, a literal "sale" of the product is not required. Rather, it is enough that the product has been cast "into the stream of commerce." *See Blueflame Gas, Inc.,* 679 P.2d at 589; *Jackson,* 673 P.2d at 365.

farm" was "defective and unreasonably dangerous to the consumer or the ultimate user." Even if this claim is construed to relate to the physical facilities by which electricity was carried to the dairy barn, and not to the electricity itself, we believe the claim must nevertheless fail.

The court of appeals held that even though electricity is a product, an electrical distribution system must be characterized as a service, and therefore any inadequacies in such a distribution system cannot provide a foundation for imposition of strict products liability. This view finds support in the cases that have considered the issue in these terms.

Home Light and Power provides a service to its customers by delivering its product, electricity. The delivery system itself, however, is part of the service rather than a component of the product. *See United Pacific Insurance Co. v. Southern California Edison Co.,* 163 Cal.App.3d 700, 209 Cal.Rptr. 819, 823 (1985); *Genaust,* 343 N.E.2d at 470; *Hedges,* 396 N.E.2d at 935; *Aversa,* 451 A.2d at 979. "The electric company's transmission and distribution lines are not a part of the end product which reaches the consumer as in the case of bottles and cans which are a part of the finished product." *Petroski v. Northern Indiana Public Service Co.,* 171 Ind.App. 14, 354 N.E.2d 736, 747 (1976). *See also Genaust v. Illinois Power Co.,* 62 Ill.2d 456, 343 N.E.2d 465, 469–70 (1976) (wires used to transmit electricity are not "packaging" of electrical product and therefore not part of product being sold). Home Light and Power is in the business of providing electricity for consumption but it is not in the business of providing transmission lines for disposition by the consumer. *See Restatement (Second) of Torts* § 402A(1)(a) (§ 402A applies only if "the seller is *engaged in the business of selling such a product* ") (emphasis added). *Cf. St. Luke's Hospital v. Schmaltz,* 188 Colo. 353, 358–59, 534 P.2d 781, 783–84 (1975) (blood provided by hospital only as an inci-

dent to transaction for medical services; blood therefore not a "marketed product" in context where essential nature of transaction was the providing of medical services).[6] Transmission lines are not products intended for consumption, because they generally remain in the control of the supplier and are not placed in the stream of commerce. *United Pacific Insurance Co.,* 209 Cal.Rptr. at 823; *Hedges,* 396 N.E.2d at 935; *Petroski,* 354 N.E.2d àt 747; *Genaust,* 343 N.E.2d at 470.

> Using the water utility analogy developed previously, suppose the boy fell into the water due to a defectively constructed concrete walkway which collapsed. The concrete which partially gave way, although defective, was only an instrumentality used *by* the water utility in connection with its business. The walkway itself certainly is not in the stream of commerce.

Comment, *Torts of Electric Utilities,* 11 Loy.L.A.L.Rev. at 793 (emphasis in original). *Cf. Shook v. Jacuzzi,* 59 Cal.App.3d 978, 129 Cal.Rptr. 496 (1976) (employee could not recover under theory of strict products liability for injuries caused by machine manufactured by employer for use in its own business; machine not sold or otherwise placed in the stream of commerce). Unlike electricity that has been delivered to the consumer, therefore, a public utility's distribution system is not a product for purposes of § 402A.

The plaintiffs contend, however, that the distribution line and electrical power must be considered as a package and that the overhead power line with its high voltage load cannot be separated from the lower voltage electricity and distribution facilities between the transformer and the dairy barn. Where, as here, the utility maintains complete ownership and control of the facilities in question, a point that was undisputed in the present case, we discover no basis in logic or precedent to view the entire distribution line and associ-

---

6. We have held blood to be a product, however, in the context of a sale by a blood bank for transfusions, because the blood bank was not supplying medical services. *Belle Bonfils Me-* *morial Blood Bank v. Hansen,* 195 Colo. 529, 579 P.2d 1158 (1978). *Accord Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118 (Colo. 1983).

ated electricity as a product sold or released into the stream of commerce by Home Light and Power. There is no ignoring the fact that only electricity at marketable voltage, delivered at a point beyond the transformer, is ever intended to reach and be used by the consumer. The other components of the system only facilitate the delivery of this electricity. Therefore, we view it as not at all artificial to conclude that only electricity that has reached a location in the distribution system where it is expected to have been stepped down to a usable voltage and delivered to a consumer is a product for purposes of § 402A. Other courts have reached the same conclusion. *E.g., Pierce,* 212 Cal.Rptr. at 292; *Hedges,* 396 N.E.2d at 935; *Genaust,* 343 N.E.2d at 470; *Williams,* 234 N.W.2d at 707; *Schriner,* 501 A.2d at 1134.

### 3.

■ As demonstrated by our previous discussion, high voltage power lines do not fit easily into the traditional strict products liability conception of a "product." Our decision in this case, however, must also rest upon an analysis of whether the imposition of strict products liability for injuries caused by contact with high voltage overhead power lines is justified by the policy considerations upon which the concept of such liability is founded. We believe that considerations of public policy underlying strict products liability do not support the contention that a utility company's high voltage overhead power lines should be regarded as a product and subject to the application of strict liability.

In marketing a product, a manufacturer creates in the minds of consumers an expectation that the product is safe for its intended uses.

> The supplier, by placing the goods upon the market, represents to the public that they are suitable and safe for use; and by packaging, advertising or otherwise, he does everything that he can to induce that belief. He intends and expects that his product will be purchased and used in reliance on this assurance of safety; and it is in fact so purchased and used.... The supplier has invited and solicited the

use; and when it leads to disaster, he should not be permitted to avoid responsibility by saying that he has made no contract with the consumer.

Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L.J. 1099, 1123 (1960). The manufacturer is generally in a position to assure the safety of the product, and the consumer is often forced to rely on the manufacturer's implied assurance of safety. *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436, 440–44 (1944) (Traynor, J., concurring); 1 R. Hursh & H. Bailey, *American Law of Products Liability,* § 4.3, at 643 (2d ed. 1973). *See also Ransome,* 275 N.W.2d at 647. While consumers of electricity are induced to purchase electricity and rely on the power company's assurance that the electricity is safe for its intended uses, the same cannot be said for the transmission and distribution system itself. That system is merely the means for delivering the product to the consumer and is never intended to reach the consumer. As such, the distribution system itself creates few of the expectations in consumers that the electricity does.

We also consider whether imposition of strict liability for transmission of high voltage electricity in overhead power lines will provide an economic incentive to improve product safety. *See Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 218 (Colo.1984). "While this is true with respect to most manufacturers and others who distribute their products, it is less apt as applied to a public utility that is very closely regulated with regard to safety." *United Pacific Insurance Co. v. Southern California Edison Co.,* 163 Cal.App.3d 700, 209 Cal.Rptr. 819, 824 (1985). The legislature has granted the Public Utilities Commission (Commission) broad discretion to adopt regulations for public safety, *see* §§ 40–4–101, –106, –108, 17 C.R.S. (1984 and 1986 Supp.), and many facets of the construction and maintenance of overhead power lines have been addressed by requiring utilities to comply with relevant provisions of the National Electric Safety Code. We agree with the California Court of Appeals that "[i]n

the case of a regulated public utility there is less need than in the case of an unregulated manufacturer to motivate safety precautions by the economic sanction of strict liability[,]" at least with respect to high voltage overhead power lines. *United Pacific Insurance Co.*, 209 Cal.Rptr. at 824.

Another important policy consideration is whether the manufacturer is in a position to spread the risk of loss among all who use the product. *See United Pacific Insurance Co.*, 209 Cal.Rptr. at 823; Prosser, *supra*, 69 Yale L.J. at 1120; *Restatement (Second) of Torts* § 402A Comment c (1965). *See generally Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1962) (Strict liability insures "that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by injured persons who are powerless to protect themselves."). Electric utilities differ from other businesses in that they are not free to make and "implement the types of business decisions made by ordinary businesses to mitigate the effects of strict liability." Comment, *Torts of Electric Utilities*, 11 Loy.L.A.L.Rev. at 803. *See also United Pacific Insurance Co.*, 209 Cal. Rptr. at 823. They may not increase their rates without scrutiny by the Commission, §§ 40–3–102, –104, –111, 17 C.R.S. (1984 & 1986 Supp.), and their rates are limited to those that are "just and reasonable" as determined by the Commission, §§ 40–3–101, –111, 17 C.R.S. (1984). Any approval by the Commission can be obtained only by going through elaborate and time-consuming procedures. Furthermore, an electric utility is not free to cease service to a particular area on the basis that serving that area is unprofitable, absent compliance with requirements of the Commission, § 40–4–101, 17 C.R.S. (1984), and the Commission has the authority to require an electric utility to make "additions, extensions, repairs, or improvements" to the utility's existing facilities if the Commission finds such changes are necessary to "secure adequate service or facilities" for the public or the utility's employees, § 40–4–102, 17 C.R.S. (1984).

In short, electric utilities are highly regulated with respect to how they operate and what rates they are permitted to charge for their products. Therefore, electric utilities are not as free as ordinary, unregulated private businesses to raise their prices and spread the costs of strict liability among their consumers. *See United Pacific Insurance Co.*, 209 Cal.Rptr. at 823; Comment, *Torts of Electric Utilities*, 11 Loy.L. A.L.Rev. at 801–05.[7]

Based upon the foregoing discussion, it is apparent that the policy considerations that form the foundation for the imposition of strict liability are of limited applicability to an electric utility's high voltage overhead power lines. We conclude that such considerations supply no persuasive basis for extending strict products liability to facts such as those presented by the case before us.

### III.

The unavailability of a strict products liability claim in cases of this kind does not mean that the consuming public is without recourse against electric utility companies when those companies are negligent in the design, construction or maintenance of power lines. An electric utility company is held to the "highest degree of care which skill and foresight can attain consistent with the practical conduct of its business under the known methods and the present state of the particular art." *Denver Consolidated Electric Co. v. Simpson*, 21 Colo. 371, 376–77, 41 P. 499, 501 (1895).

7. Another policy consideration is that strict products liability arose, in part, out of "the difficulty of finding the negligent party and effectuating a recovery from that party." *Wright v. Creative Corp.*, 30 Colo.App. 575, 582, 498 P.2d 1179, 1182 (1972). *See Kaplan v. C Lazy U Ranch*, 615 F.Supp. 234, 238 n. 3 (D.Colo.1985); *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d at 589–90; 1 R. Hursh & H. Bailey, *supra*, §§ 4.2, 4.7; Prosser, *supra*, 69 Yale L.J. at 1116–17. We do not believe that those difficulties generally exist with regard to overhead power lines. The parties who manufacture, construct and maintain such lines can generally be identified with little difficulty.

*Accord Federal Insurance Co. v. Public Service Co.*, 194 Colo. 107, 570 P.2d 239 (1977); *Blankette v. Public Service Co.*, 90 Colo. 456, 10 P.2d 327 (1932). The jury in the present case was properly instructed as to Home Light and Power's duty of care, and it returned a verdict in favor of Home Light and Power on the plaintiffs' negligence claim.

The transmission of electricity, as well as the transmission of other similar type consumable goods, is a service being rendered by the utility to prospective purchasers. While being transmitted, liability is controlled by standards of negligence and not strict liability, since any injury sustained as a result thereof is causally connected only to the transmission or transportation service and is unrelated to the ultimate sale of the product.

*Aversa*, 451 A.2d at 979.

We are in accord with the vast majority of jurisdictions that have considered the issue now before us in concluding that summary judgment was properly awarded to Home Light and Power on the plaintiffs' claim for relief under § 402A with respect to the high voltage overhead power line. *See Pierce*, 212 Cal.Rptr. 283; *United Pacific Insurance Co.*, 209 Cal.Rptr. 819; *Hedges*, 396 N.E.2d 933; *Petroski*, 354 N.E.2d 736; *Genaust*, 343 N.E.2d 465; *Williams*, 234 N.W.2d 702; *Wood v. Public Service Co.*, 114 N.H. 182, 317 A.2d 576, 579–80 (1974); *Farina*, 438 N.Y.S.2d 645; *Schriner*, 501 A.2d 1128; *Erwin v. Guadalupe Valley Electric Co-op*, 505 S.W.2d 353 (Tex.Civ.App.1974); *Ransome*, 275 N.W.2d 641; *Kemp*, 172 N.W.2d 161. *See generally* 3 F. Harper, F. James & O. Gray, *The Law of Torts* § 14.4, at 207–11 (2d ed. 1986).

The judgment of the court of appeals is affirmed.