**IMPERIAL DISTRIBUTION SERVICES, INC., A Delaware Corporation, and Paul F. Larned, Petitioners,**

v.

**Marion K. FORREST and Julia A. Forrest, Respondents.**

**No. 85SC259.**

Supreme Court of Colorado,
En Banc.

July 27, 1987.

Rehearing Denied Sept. 8, 1987.

Greengard & Senter, William L. Senter, Mark C. Overturf, Denver, for petitioners.

William E. Myrick, P.C., William E. Myrick, Denver, for respondents.

VOLLACK, Justice.

The petitioners, Imperial Distribution Services, Inc. [hereinafter Imperial] and its employee, Paul F. Larned, seek reversal of the court of appeals' decision in *Forrest v. Imperial Distribution Services, Inc.*, 712 P.2d 488 (Colo.App.1985). In reversing a judgment entered on a jury verdict in favor of the petitioners, the court of appeals held that the determination of whether the petitioners were required to exercise the highest degree of care or simply "reasonable care" was a question of fact for the jury. We granted certiorari and now reverse the judgment of the court of appeals and remand for reinstatement of the jury verdict.

## I.

The events of this case occurred at the site of a waste dump in Adams County owned by Landfill, Inc. [hereinafter Landfill]. The respondent, Marion K. Forrest, was employed by Landfill to operate heavy equipment at the dump, and was injured on March 15, 1979, when he was splashed in the face with a caustic cleaning agent. He sued Imperial and Larned on the grounds of negligence and strict liability. At trial, the parties presented conflicting evidence of the events leading up to the accident. However, the facts relevant to our determination of whether the jury was properly instructed by the trial court are sufficiently clear.

Imperial is in the business of warehousing and distributing products for its customers. None of the products handled by Imperial are manufactured, sold or owned by it. One of its customers, Economic Laboratories, Inc. [hereinafter Economic], is a manufacturer of cleaning compounds, including a liquid cleaning agent supplied to restaurants, schools, and hospitals, known by the name "Super Trump." Super Trump is composed of approximately 50% potassium hydroxide, is highly alkaline in nature, and corrosive, capable of causing burns when it comes in contact with human tissue. Super Trump is a biodegradable material.

As part of the service Imperial provides to its customers, Imperial disposes of customers' merchandise when given instructions to do so. On March 15, 1979, Imperial instructed Larned to dispose of a load of

merchandise at the Landfill dumpsite. The load consisted of numerous pallets of candy bars, together with miscellaneous items owned by Economic. The Economic items included various liquids, such as a cleaning compound called "Bowl Cleanse," containing hydrochloric (muriatic) acid, and five gallons of "Eco Klene," listed as an alkaline liquid, both described as corrosive material. Also included was Super Trump, which was contained in a fifteen-gallon cardboard barrel with a plastic bladder inside.

Larned was given directions to see that this load received a "special burial." A special burial is a service provided by Landfill for which customers pay extra to insure that the load being disposed of is destroyed and buried to prevent theft or salvaging. Imperial requested that an Adams County sheriff be present at the Landfill site when the materials were dumped to insure nothing was taken.

When Larned arrived at Landfill he presented invoices, listing the items being disposed, to a Landfill employee who signed and dated them. Three invoices pronounced that "hazardous materials" were present. When the sheriff arrived at Landfill, Larned proceeded to an area within the dump and unloaded his truck, throwing all the items, including the Super Trump, on the ground. There was conflicting evidence as to whether the Super Trump barrel had a sign indicating "corrosives." Larned and the sheriff stayed at the dumpsite long enough to see a large vehicle called a compactor run over and crush part of the Imperial load. They did not observe the accident.

The events immediately prior to Forrest's injuries are unclear. The petitioners contend that Forrest was looking at the load left by Imperial with the intent to salvage some of the items, which is against Landfill's policy. Forrest testified that the machine he was operating had become stuck in soft dirt and that he left his machine to get help from another employee. In any event, the respondent was approximately fifteen to twenty-five feet away from the load left by Imperial as it was being crushed. When the Super Trump barrel was crushed, it burst, spraying liquid on the respondent. Approximately one cup of the liquid was splashed onto the respondent's face, causing the loss of sight in the respondent's left eye, partial impairment of sight in his right eye, and facial burns.

The respondent brought this action against Imperial and Larned to recover damages for personal injuries; his wife sought damages for loss of consortium. A jury trial was held and judgment was entered on a jury verdict in favor of the defendants. The Forrests appealed the judgment to the court of appeals contending that the trial court erred in refusing their tendered instructions on inherently dangerous and ultrahazardous activities. The trial court rejected jury instructions tendered by the respondents which would have permitted the jury to determine whether the petitioners, in delivering the Super Trump, should have exercised the highest degree of care.[1] The trial court

---

1. One of the rejected jury instructions stated:
   A defendant engaged in an inherently dangerous activity, such as the dumping or disposal of hazardous liquid chemicals, is charged with a non-delegable duty to use the highest degree of care to prevent injury to others. An inherently dangerous activity need not be extremely or even highly dangerous, but must only present a foreseeable and significant risk of harm to others if not carefully carried out. A corporate defendant cannot escape liability for injury resulting from that activity solely by a claim that he delegated his duty or relied on others to exercise that duty.
   The respondents' instruction is derived from the law set forth in *Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978).

In *Western Stock Center*, we stated that "an inherently dangerous activity need not be extremely or even highly dangerous, but must only present a foreseeable and significant risk of harm to others if not carefully carried out. The determination of what constitutes an inherently dangerous activity should be made by the trier of fact." *Id.* at 378, 578 P.2d at 1050. The issue in that case was whether to apply the inherently dangerous activity exception to the general rule of nonliability for those who employ independent contractors. *See Restatement (Second) of Torts* § 427 (1965). We held that a jury could find the use of an electric cutting torch in the removal of ammonia pipes from a building to be inherently dangerous when it led to the destruction of the premises by fire. We

instructed the jury that the petitioners were required to exercise reasonable care.

The court of appeals reversed the judgment, holding that "given the highly caustic nature of the cleaning compound, the jury could have reasonably determined that it was a dangerous substance and that the [petitioners], in delivering the material to the dumpsite, were engaged in an inherently dangerous activity." *Forrest,* 712 P.2d at 490. The petitioners contend that the court of appeals erred in holding that whether Imperial and Larned owed a duty to exercise the highest degree of care was a question of fact for the jury. We agree.

## II.

■ The court determines, as a matter of law, the existence and scope of the duty to which a defendant is to be held. *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313 (Colo.1980); *see Jefferson County School Dist. v. Justus,* 725 P.2d 767 (Colo.1986);[2] *Restatement (Second) of Torts* § 328B (1965).[3] The commentators to the *Restatement* note that "[o]nce the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform." *Restatement (Second) of Torts* § 328B comment f (1965). The case law and the *Restatement* clearly define the functions of the court in determining the standard of care to be applied in negligence cases. To the extent that the language of the court of appeals can be read to assign any part of this determination to the jury, the court of appeals erred.[4]

It is axiomatic that in engaging in a particular activity every person is "bound to exercise that reasonable care and caution which would be exercised by a reasonably prudent and cautious person under the same or similar circumstances." *Denver Consol. Elec. Co. v. Simpson,* 21 Colo. 371, 376, 41 P. 499, 501 (1895). *Accord Blankette v. Public Serv. Co.,* 90 Colo. 456, 10 P.2d 327 (1932). We have also stated that under this reasonable person standard "the greater the risk, the greater the amount of care required to avoid injury to others." *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 587 (Colo.1984). Thus, what constitutes reasonable care varies according to the degree of risk associated with the particular activity. "[G]reater care may be required of one who dispenses a product in the stream of commerce when the product itself, by virtue of its inherent character,

did not address the standard of care to which the employer would be held.

2. In this case, we held that whether the school district had assumed duties of care over respondent child, by voluntarily undertaking to render a service, was a mixed question of law and fact, since a determination that a defendant has assumed a duty is predicated on factual findings. *Justus,* 725 P.2d at 771. Accordingly, we held that summary judgment was not appropriate under these circumstances. This is a different situation from the instant case which was submitted to the jury after full presentation of the evidence.

3. Section 328B of the *Restatement (Second) of Torts* reads as follows:

In an action for negligence the court determines

(a) whether the evidence as to the facts makes an issue upon which the jury may reasonably find the existence or non-existence of such facts;

(b) whether such facts give rise to any legal duty on the part of the defendant;

(c) the standard of conduct required of the defendant by his legal duty;

(d) whether the defendant has conformed to that standard, in any case in which the jury may not reasonably come to a different conclusion;

(e) the applicability of any rules of law determining whether the defendant's conduct is a legal cause of harm to the plaintiff; and

(f) whether the harm claimed to be suffered by the plaintiff is legally compensable.

Comment c to this section states that "[t]he determinations stated in this Section are always for the court to make. They are never for consideration or determination by the jury."

4. In *Metropolitan Gas Repair Service, Inc. v. Kulik,* we stated that the lower court's statement that "once the existence of a duty is established, the particular scope of that duty is a question for the trier of fact," *Kulik v. Public Serv. Co.,* 43 Colo.App. 139, 142, 605 P.2d 475, 478 (1979), was an incorrect statement of law if the statement was intended as a description of the allocation of function between the court and the jury in the determination of the standard or measure of a defendant's duty. 621 P.2d 313, 317 (Colo.1980).

poses a high risk of injury to others." *Id.* at 588.

In *Simpson,* a case involving the delivery of electricity, we held that a trial court may properly instruct a jury on the "highest degree of care" standard only "where all minds concur" that a business, by its inherent nature, is "fraught with peril to the public." *Simpson,* 21 Colo. at 377, 41 P. at 501. We went on to state that "[w]here the facts of a case naturally lead equally intelligent persons honestly to entertain different views as to the degree of care resting upon a defendant, the court ought not to lay down a rule prescribing any particular or specific degree in that case." *Id.* Only in limited circumstances have we held that an instruction on the highest degree of care is required. *See Blueflame Gas,* 679 P.2d 579 (distribution of propane); *Federal Ins. Co. v. Public Serv. Co.,* 194 Colo. 107, 570 P.2d 239 (1977) (distribution of electricity). It is only where all minds concur that the defendant is engaged in an activity that poses a high risk of injury to others that the court, *as a matter of law,* may instruct the jury to hold the defendant to the highest standard of care. *See Blueflame Gas,* 679 P.2d at 587–89.

The enhanced standard of care theory holds that the reasonable or ordinary care in cases such as delivering electricity, which all must acknowledge to pose a high risk of injury to others, is "the highest care which human ingenuity can practically exercise, and that, *as a matter of law,* courts will hold every reasonably prudent and careful [person] to the exercise of the utmost care and diligence in protecting the public from the dangers necessarily incident to the carrying on of a hazardous business." *Simpson,* 21 Colo. at 377, 41 P. at 501 (emphasis added). In every case, the standard of care is always one of reasonable care.[5]

In cases following our decision in *Simpson,* we have consistently focused on the inherently dangerous nature of the activity and the ability of the public to recognize and guard against the risks posed by that activity in determining whether all must agree that a particular activity poses a degree of risk warranting an instruction to the jury on the highest degree of care. *See Pizza v. Wolf Creek Ski Dev. Corp.,* 711 P.2d 671 (Colo.1985); *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579 (Colo. 1984); *Federal Ins. Co. v. Public Serv. Co.,* 194 Colo. 107, 570 P.2d 239 (1977); *Blankette v. Public Serv. Co.,* 90 Colo. 456, 10 P.2d 327 (1932). For instance, in *Federal Insurance Co.,* we again addressed the degree of care owed by an electric utility in supplying electricity to the general public, eighty-two years after *Simpson* was decided. Despite the technological advances wrought in the passing years, we did not hold in *Federal Insurance Co.* that the jury should decide whether the transmission of electricity was so fraught with peril to the public as to require parties engaged in that activity to exercise the highest degree of care. Instead, we considered the issue *de novo,* as a matter of law, and stated:

> Compelling reasons continue to exist to warrant the requirement that electric utilities conduct their business with the "highest degree of care": (1) electrical energy possesses inherently dangerous properties, (2) electric utilities possess

---

5. In *Simpson,* we were reluctant to carve out a distinct "highest degree of care" standard:

> We think the court was unfortunate in attempting to draw any distinctions in the degrees of care or negligence. It would have been safer and the better practice to instruct the jury ... that the defendant was bound to exercise that reasonable care and caution which would be exercised by a reasonably prudent and cautious person under the same or similar circumstances. In addition to this, the jury should have been instructed that the care increases as the danger does, and that where the business in question is attended with great peril to the public, the care to be exercised by the person conducting the business is commensurate with the increased danger.

21 Colo. at 376–77, 41 P. at 501. This suggestion was abandoned in *Denver Consolidated Electric Co. v. Lawrence,* 31 Colo. 301, 73 P. 39 (1903), where the court held that the instructions given in that case, those of reasonable care and that reasonable care increases as does the danger (as suggested in *Simpson*), "did not declare the law" and were inadequate. The *Lawrence* court required a highest degree of care instruction.

expertise in dealing with electrical phenomena and in operating facilities for delivery of electricity, and (3) the general public is not able to recognize and guard against the dangerous potential of certain situations.

194 Colo. at 112, 570 P.2d at 242. In *Pizza v. Wolf Creek Ski Development Corp.*, we applied the test set forth in *Federal Insurance Co.* to consider whether the operation of a ski area warranted the duty to exercise the highest degree of care, and determined as a matter of law that it did not. We cited with favor the court of appeals' application of the *Federal Insurance Co.* test in *Mannhard v. Clear Creek Skiing Corp.*, 682 P.2d 64 (Colo.App.1983).

Under the facts of this case, we find that reasonable minds could disagree as to the degree of risk associated with delivering Super Trump to the dumpsite for disposal, as determined by the level of dangerousness of the activity and the public's ability to recognize and guard against the risks.[6] As such, the trial court properly instructed the jury on the reasonable person standard. The reasonable person standard leaves for the jury to decide what degree of care a reasonable person would have used in the given situation.[7]

Accordingly, we reverse the court of appeals and remand with directions to reinstate the judgment based on the jury verdict in favor of the petitioners.

QUINN, C.J., dissents.

**QUINN, Chief Justice, dissenting:**

The majority determines that under the facts of this case reasonable minds could disagree as to whether the delivery of a corrosive liquid to a dumpsite for disposal requires the highest degree of care, but goes on to conclude that the trial court did not err in refusing to instruct the jury that one engaging in this activity is held to the highest standard of care. I agree with the majority that reasonable minds could differ as to the degree of care which the defendants were required to exercise in this case. However, it is precisely this potential for reasonable disagreement that leads me to conclude that the jury should have been instructed that one engaging in an inherently dangerous activity is required to exercise the highest degree of care. In this case the plaintiffs tendered an instruction which, in effect, did just that. I believe that the trial court's refusal to submit that instruction to the jury was error, and I accordingly dissent from the majority opinion.

As the majority recognizes, our cases have consistently held that what constitutes reasonable care varies according to the degree of risk associated with the activity involved. We have on occasion held that certain activities, such as the supplying of electricity or propane gas, are so inherently dangerous and involve such a high degree of risk to others that a jury

6. We note that the transportation and disposal of hazardous wastes are now strictly and comprehensively regulated. Potassium hydroxide and hydrochloric acid, the chemicals involved here, are listed as hazardous materials which must meet detailed packaging, labeling, handling, transporting, loading and unloading specifications under 49 C.F.R. §§ 172.101, 173.249 and 249a, 177.800–.848 (1976), implementing the Hazardous Materials Transportation Act, 49 U.S.C. § 1801–12 (1974). The chemicals also have been designated as hazardous wastes under the corrosivity standard of the Environmental Protection Agency's hazardous waste regulations, 40 C.F.R. § 261.22(a)(1) (1980), implementing the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6905–87 (1976), which deals with the disposal of hazardous wastes; and under 40 C.F.R. § 302.4, implementing the Comprehensive Environmental Response, Compensation, and Liability Act (CERC-

LA or Superfund), 42 U.S.C. §§ 9601–57 (1980), which concerns the clean up of already contaminated sites. Under present standards, hazardous wastes of the kind involved in this case may be disposed of only at RCRA approved sites. 40 C.F.R. §§ 265.1—265.430 (1980), or 6 C.C.R. 1007–3, Parts 260–267 (adopted Aug. 15, 1984), Parts 2, 99, 100 (adopted Aug. 21, 1985).

7. It would be helpful, in light of the importance of the reasonable person standard, to clarify for the jury its role in determining what degree of care constitutes reasonable care. We think it would be better practice to instruct the jury, in addition to the traditional reasonable care instruction, that the degree of care that constitutes reasonable care in a particular case increases in proportion to the degree of risk associated with the particular activity. *See, e.g., Blueflame,* 679 P.2d at 587–88.

must be instructed that those engaging in them are held to the highest degree of care. In my view, even when it cannot be said that the activity engaged in by a defendant is inherently dangerous as a matter of law, the jury nonetheless should still be so instructed as long as there is a sufficient basis in the evidence to support a finding that the activity in question was indeed an inherently dangerous activity. Giving such an instruction under these circumstances is simply a recognition of the long-standing principle that a party is entitled to an instruction setting forth his theory of the case when that instruction is consistent with existing law and is supported by the evidence. *E.g., Federal Insurance Co. v. Public Service Co.*, 194 Colo. 107, 570 P.2d 239 (1977); *Maloney v. Jussel*, 125 Colo. 125, 241 P.2d 862 (1952); *Rocky Mountain Fuel Co. v. Bakarich*, 66 Colo. 275, 180 P. 754 (1919).

In this case the court recognizes that "it would be better practice to instruct the jury, in addition to the traditional reasonable care instruction, that the degree of care that constitutes reasonable care in a particular case increases in proportion to the degree of risk associated with a particular activity." Major. op. at 1256 n. 7. Although instruction no. 22 tendered by the Forrests and referred to in footnote 1 of the court's opinion was properly refused, in that it conclusively presumed that the dumping or disposal of the hazardous waste chemicals was an inherently dangerous activity, the majority overlooks the fact that the Forrests tendered an instruction which accorded with the "better practice" advocated in footnote 7 of the court's opinion. The Forrests tendered the following instruction no. 20, which the trial court rejected:

> One carrying on an inherently dangerous activity must exercise the highest possible degree of skill, care, caution, diligence and foresight with regard to that activity, according to the best technical, mechanical and scientific knowledge and methods which are practical and available at the time of the claimed conduct which caused the claimed injury. The failure to do so is negligence.

This tendered instruction is taken verbatim from CJI–Civ.2d 9:5 and describes the legal duty applicable to one engaging in an inherently dangerous activity. *See Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313, 317 (Colo.1980). As we recognized in *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 588–89 (Colo.1984), "[a]n instruction formulated in terms of the highest degree of care is nothing more than a plain statement to the jury that the inordinate risk posed by [the activity] requires an amount of care commensurate with that risk." The Forrests' tendered instruction no. 20 did not improperly relegate to the jury the function of determining whether the defendant owed a legal duty to the plaintiff, nor did it vest the jury with the authority to determine the standard of conduct or care applicable to that duty. While questions of the existence and scope of duty were for the court, not the jury, to determine, *Kulik*, 621 P.2d at 317; Restatement (Second) of Torts § 328B (1965), the question of the defendant's breach of a legal duty was an issue of fact which the jury was required to decide under the evidence admitted during the trial and under appropriate instructions of law.

A trial court's refusal to give an instruction to which a party is entitled may constitute reversible error. *E.g., Federal Insurance Co.*, 194 Colo. 107, 570 P.2d 239. Since the Forrests' tendered instruction no. 20 was an accurate statement of the law, and since there was ample evidence to support a conclusion that the activity engaged in by the defendants was an inherently dangerous activity requiring the highest degree of care, I would hold that the trial court's rejection of the Forrests' tendered instruction no. 20 was reversible error. I would accordingly affirm the judgment of the court of appeals and would remand the case for a new trial.